IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–02016–EWN–MEH

THOMAS W. SABIN,

      Plaintiff,

v.

AMREP INC., a Delaware corporation,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

      This is an age discrimination case. Plaintiff Thomas W. Sabin asserts that Defendant Amrep, Inc., violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, by terminating his employment on the basis of his age. This matter is before the court on "Defendant's Motion for Summary Judgment," filed July 9, 2007. Jurisdiction is premised upon 28 U.S.C. §§ 1331, 1367.

## FACTS

### 1. Factual Background

#### a. The Parties

      Defendant is a manufacturer of specialty chemicals, such as cleaners and lubricants. (Br. in Supp. of Def.'s Mot. for Summ. J. [hereinafter "Def.'s Br."], Statement of Disputed Facts [hereinafter "SOF"] ¶ 1 [filed July 23, 2007]; *admitted at* Pl.'s Br. in Opp'n to Def.'s Mot. for

Summ. J. [hereinafter "Pl.'s Resp."], Resp. to Statement of Undisputed Facts [hereinafter "RSOF"] ¶ 1 [filed Sept. 14, 2007].)  In December 1993, Defendant hired Plaintiff to sell its chemicals to corporate clients in a territory spanning Colorado, Utah, Wyoming, and New Mexico.  (*Id.*, SOF ¶¶ 6–7; *admitted in relevant part at* Pl.'s Resp., RSOF ¶¶ 6–7.)  Plaintiff was fifty-two years old at the time of his separation from Defendant on July 29, 2005.  (*Id.*, SOF ¶ 5; *admitted at* Pl.'s Resp. RSOF ¶ 5.)

### b.    *Corporate Downturn*

In the summer of 2005, Defendant was struggling financially.  (*Id.*, SOF ¶ 100; *admitted at* Pl.'s Resp., RSOF ¶ 100.)  At the time, Defendant estimated that commissions for its sales force would drop by $800,000 annually due to: (1) the loss of one of Defendant's largest customers, Unisource; and (2) Defendant's decision to reorganize its sales to low-volume customers.  (*Id.*, SOF ¶¶ 103, 105–09; *admitted at* Pl.'s Resp., RSOF ¶¶ 103, 105–09.)  Accordingly, Defendant decided to consolidate its sales territories and reduce its sales force.  (*Id.*, SOF ¶¶ 110, 116; *admitted at* Pl.'s Resp., RSOF ¶¶ 110, 116.)

Eventually, Defendant eliminated four sales territories.  (*See* Pl.'s Resp., Statement of Additional Disputed Facts [hereinafter "SAF"] ¶ 61; *admitted at* Def.'s Reply Br. in Supp. of Mot. for Summ. J., Resp. to Statement of Additional Facts [hereinafter "RSAF"]¶ 61 [filed Oct. 22, 2007]; Pl.'s Resp., Ex. 12 [Territory Maps].)  Defendant fired three of the four sales representatives whose territories were eliminated.  (*See* Pl.'s Resp., Ex. 4 at 122–23 [Stout Dep.].)  The fourth representative had retired.  (*Id.*)  All three terminated representatives were in their fifties.  (*See* Def.'s Br., Ex. A–1 ¶ 10 [Lavergne Aff.].)

Plaintiff's territory, Territory Fourteen, was not eliminated. (Def.'s Br., SOF ¶ 137; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 137.) Instead: (1) Territory Fourteen was expanded into Arizona, Nevada, and Texas; (2) Plaintiff was terminated; (3) and Regional Manager Dan Sherwood, who was thirty-four years old at the time, took over the expanded territory. (*Id.*, Ex. A–11 at 79–80 [Simonson Dep.], Ex. A–6 at 118–19 [Stout Dep.], SOF ¶¶ 27, 146; *admitted at* Pl.'s Resp., RSOF ¶¶ 27, 146.)

### c.    *Mr. Sherwood*

Defendant hired Mr. Sherwood in September 2003 as a sales representative dedicated to serving only one client, Unisource. (Def.'s Br., SOF ¶ 26; *admitted at* Pl.'s Resp., RSOF ¶ 26.) Plaintiff had recommended Mr. Sherwood for the position. (Pl.'s Resp., Ex. 19 at 135–36 [Pl. Dep.].) After Mr. Sherwood was hired, Plaintiff introduced him to Defendant's customers in Territory Fourteen. (*Id.*, Ex. 1 ¶ 130 [Pl. Aff.].) Defendant's executive in charge of sales representatives, Roger Stout, testified that he believed Mr. Sherwood: (1) was comfortable with Territory Fourteen; and (2) had industry contacts in Utah, Idaho, and Colorado. (Def.'s Br., SOF ¶¶ 22, 146; *admitted at* Pl.'s Resp., RSOF ¶¶ 22, 146.)

In February 2005, Defendant promoted Mr. Sherwood to the position of Regional Manager for Defendant's Western Division. (*Id.*, SOF ¶ 32; *admitted at* Pl.'s Resp., RSOF ¶ 32.) As Regional Manager, Mr. Sherwood worked out of California. (Pl.'s Resp., Ex. 19 at 99 [Pl. Dep.].) As Regional Manager, Mr. Sherwood spent one-fourth of his time working with sales representatives — including Plaintiff — to help them develop new business and educate their customers. (Def.'s Br., SOF ¶ 33; *admitted at* Pl.'s Resp., RSOF ¶ 33.) Mr. Sherwood spent the

remainder of his time servicing the Unisource account. (*Id.*, Ex. A–5 at 87 [Pl. Dep.].) Thus, once Unisource withdrew its business, Mr. Sherwood's sales responsibilities evaporated. (Pl.'s Resp., SAF ¶ 54; *admitted at* Def.'s Reply, RSAF ¶ 54.)

Plaintiff testified that prior to Plaintiff's termination, Mr. Sherwood told him he "hated" being located in California and wanted to move to Salt Lake City because "his wife's family is from there." (*Id.*, Ex. 19 at 99 [Pl. Dep.].) In his affidavit, Plaintiff stated that Mr. Sherwood had told him "on more than one occasion that he wanted to move back to Utah." (*Id.*, Ex. 1 ¶ 64 [Pl. Aff.].)

### d.    *The Decision to Replace Plaintiff*

### i.    *The Recommendation*

It fell upon Mr. Stout to make the initial determination of how to restructure Defendant's sales force. (*See* Def.'s Br., SOF ¶ 144; *admitted at* Pl.'s Resp., RSOF ¶ 144.) At the time of Plaintiff's termination, Mr. Stout was fifty-six years old. (*Id.*, SOF ¶ 25; *admitted at* Pl.'s Resp., RSOF ¶ 25.) Mr. Stout considered both Plaintiff and Mr. Sherwood for the expanded Territory Fourteen. (*Id.*) Mr. Stout testified that he decided Mr. Sherwood "was the right individual for the job" based on customer feedback, coworker feedback, and Mr. Stout's experience working with both men. (*Id.*, Ex. A–6 at 132, 151 [Stout Dep.]; *accord id.*, Ex. A–11 at 80–82 [Simonson Dep.].)

Shortly after making this decision, Mr. Stout met with senior executive Dave Simonson in Jacksonville, Florida, to discuss the reorganization. (*Id.*, SOF ¶¶ 116, 120; *admitted at* Pl.'s Resp., RSOF ¶¶ 116, 120.) Mr. Stout characterized the decisionmaking process that transpired in

Jacksonville as such: "[I]t was a joint decision. I recommended to Mr. Simonson who I thought would be the best candidates going forward, and then we made a decision." (*Id.*, Ex. A–6 at 96 [Stout Dep.].) Mr. Simonson testified: "[Mr. Stout] made the decision on [Plaintiff] versus [Mr.] Sherwood, and I accepted that decision. I concurred with it after the evidence he gave me." (*Id.*, Ex. A–11 at 84 [Simonson Dep.].)

### ii. *The Execution of the Decision*

In his deposition, Mr. Stout explained how the termination was handled:

Q: And you [told Plaintiff he was terminated] for performance reasons . . . ?
A: Exactly.
Q: So [Plaintiff] was not terminated as part of downsizing. He was terminated because of his poor performance; is that —
A: He was terminated because of the downsizing.
Q: Did you tell him that he was terminated because of the downsizing?
A: No, I did not.
Q: Why not?
A: It was a determination that was made by Mr. Simonson that . . . we would handle that as a performance issue. And [Mr. Simonson] felt the four individuals — two of them had performance issues and we'd handle those as performance terminations, and the other two we would offer severance packages . . . .
Q: Did Mr. Simonson tell you why [David] Patterson and [Plaintiff] were selected for termination on performance issues?
A: I think we both agreed they had performance issues, and that's the way he wanted to handle those two.

(*Id.*, Ex. A–6 at 103–04 [Stout Dep.].) Mr. Stout testified that when he terminated Mr. Patterson, he told Mr. Patterson that "we were downsizing the organization . . . and we were also concerned about some performance issues." (Pl.'s Resp., Ex. 4 at 99 [Stout Dep.].)

After Plaintiff's termination, Mr. Stout sent an email to Defendant's employees informing them that Plaintiff had left the company "to pursue other career opportunities." (*Id.*, SAF ¶ 53;

*admitted at* Def.'s Reply, RSAF ¶ 53; *see id.*, Ex. 10 [8/2/07 Email].)

### e.    Mr. Stout's View of Plaintiff's Performance

#### i.    Customer Feedback

Mr. Stout asserts that he received more complaints about Plaintiff than about any other

salesperson he supervised.  (Def.'s Br., SOF ¶ 97; *admitted at* Pl.'s Resp., RSOF ¶ 97.)  Mr.

Stout testified that in 2004, Unisource executive Jane Freeman complained to him about

Defendant's sales force in general, and then mentioned that Plaintiff: (1) had refused to end a

presentation in Denver, Colorado, even though she had asked Plaintiff to stop; and (2) had

insufficient knowledge of Defendant's product lines.  (*Id.*, SOF ¶ 40; *deemed admitted at* Pl.'s

Resp., RSOF ¶ 40; *id.*, Ex. A–6 at 171–72 [Stout Dep.].)[1]  Plaintiff denies that either of the

alleged complaints were factually correct.  (Pl.'s Resp., Ex. 1 ¶¶ 70–71 [Pl. Aff.].)  At the time he

heard the complaints, Mr. Stout did not consider firing Plaintiff.  (Pl.'s Resp., SAF ¶ 76; *admitted*

*at* Def.'s Reply, RSAF ¶ 76.)

One of Plaintiff's accounts was with Brody Chemical, which was represented by Jon

---

[1]I engage the hearsay issues raised by this testimony below.  Plaintiff denies this fact, curtly stating "[n]o such incident occurred in Denver."  (Pl.'s Resp., RSOF ¶ 40.)  In support, Plaintiff cites the following affidavit statement: "There was never a sales meeting in Denver where I refused to limit my sales presentation."  (*Id.*, Ex. 1 ¶ 70 [Pl. Aff.].)  None of this disproves Mr. Stout's testimony that Ms. Freeman complained about Plaintiff giving a lengthy presentation or conveyed her perceptions regarding Plaintiff's product knowledge.  Consequently, Defendant's assertion is deemed admitted.  I pause to note that elsewhere in his brief, Plaintiff asserts that: "Jane Freeman was dissatisfied with all [of] [Defendant's] sales representatives . . . not just [Plaintiff]."  (*Id.*, SAF ¶ 13; *admitted at* Def.'s Reply, RSAF ¶ 13.)  Plaintiff comes forward with no evidence, however, that Ms. Freeman singled out any other sales representative when speaking to Mr. Stout.

Liddiard.  (*See* Def.'s Br., SOF ¶ 50; *admitted at* Pl.'s Resp., RSOF ¶ 50.)  In late summer or early fall of 2004, Mr. Liddiard called Mr. Stout to complain that an order was taking too long.  (*Id.*, SOF ¶ 54; *admitted at* Pl.'s Resp., RSOF ¶ 54.)  Plaintiff testified that Mr. Stout told him:

> That [Mr. Liddiard] had called him, [Mr. Liddiard] w[as] having trouble getting the private label product that he wanted, that I had everything screwed up.  You know, basically that [Defendant] couldn't get him the product that he wanted, so [Mr. Liddiard] went somewhere else.

(Pl.'s Resp., Ex. 19 at 76 [Pl. Dep.].)  Plaintiff asserts that Mr. Liddiard's "problem was with Defendant, not me personally.  (*Id.*, Ex. 1 ¶ 17 [Pl. Aff.].)  Plaintiff asserts that the delay in getting the product to Brody Chemical occurred because Defendant's art department "could not work with the [product label] artwork Mr. Liddiard had sent over."  (*Id.*, Ex. 19 at 77 [Pl. Dep.].)  Mr. Stout testified that, ultimately, he was unsure about who was at fault for the dispute.  (Def.'s Br., Ex. A–6 at 171 [Stout Dep.].)  Mr. Stout testified that he was concerned because he felt the relationship between Plaintiff and Mr. Liddiard was "dissolving."  (*Id.*, Ex. A–6 at 169 [Stout Dep.].)

Charlie Black of Ikon, another of Plaintiff's clients, testified that he complained to Mr. Stout that ever since Plaintiff had complained to him about changes to Defendant's commission structure, Plaintiff had exhibited a changed attitude.  (*Id.*, Ex. A–12 at 19 [Black Dep.]; *accord id.*, Ex. A–6 at 174 [Stout Dep.].)  Mr. Black recalled complaining that "when the change in attitude took place, it just didn't seem like we had the same kind of response from [Plaintiff] or the same desire to help us grow."  (*Id.*, Ex. A–12 at 21 [Black Dep.]; *accord id.*, Ex. A–6 at 174 [Stout Dep.].)  Plaintiff denies that he complained to "Mr. Black about [Defendant's] commission

structure" or that his attitude or attentiveness to Ikon ever waned. (Pl.'s Resp., Ex. 1 ¶¶ 92–94 [Pl. Aff.].) Mr. Black also testified that he mentioned to Mr. Stout that "there were instances when [Plaintiff] came into [the Ikon] office and had been drinking." (Def.'s Br., Ex. A–12 at 26 [Black Dep.].) Plaintiff denies that he has a drinking problem or was ever drunk while making sales calls. (Pl.'s Resp., Ex. 1 ¶¶ 27–30 [Pl. Aff.].) Mr. Stout does not recall discussing Mr. Black's complaints with Plaintiff. (Def.'s Br., Ex. A–6 at 175 [Stout Dep.].)

### ii. Coworker Feedback

While Mr. Sherwood was Regional Manager supervising Plaintiff, Mr. Sherwood informed Mr. Stout that he had received "numerous" customer complaints about Plaintiff. (*Id.*, SOF ¶ 43; *admitted at* Pl.'s Resp., RSOF ¶ 43.) Mr. Sherwood reported to Mr. Stout that Plaintiff had performance problems, including a lack of product knowledge relating to Defendant's janitorial and sanitation ("JanSan") product line, problems with his appearance and a lack of professionalism, and a lack of motivation. (*Id.*, SOF ¶ 44; *admitted at* Pl.'s Resp., RSOF ¶ 44.) Mr. Sherwood also told Mr. Stout that Plaintiff was having a "difficult time" taking directions from Mr. Sherwood. (*Id.*, SOF ¶ 90; *admitted at* Pl.'s Resp., RSOF ¶ 90.) Mr. Stout did not speak with Plaintiff about Mr. Sherwood's complaints. (Pl.'s Resp., SAF ¶ 84; *admitted at* Def.'s Reply, RSAF ¶ 84.)

Defendant's vice president of national accounts, Clay Freebairn, testified that, sometime around the fall of 2004, he complained to Mr. Stout that Plaintiff did not know the names of new representatives of two of his own clients, Bunzl and LaGassee, and that Plaintiff was not calling on the "[T]riple S" account. (Def.'s Br., Ex. A–14 at 22, 24–25, 66 [Freebairn Dep.].) Plaintiff

asserts that: (1) he did call on the Triple S account; (2) the new person at LaGasse was not his contact there; and (3) the new person at Bunzl "had been hired a week or so before [I] visited and had not yet . . . assumed his position." (Pl.'s Resp., Ex. 1 ¶¶ 108–111 [Pl. Aff.].) Mr. Freebairn also testified that he told Mr. Stout that once when he and Plaintiff had gone to dinner after work, Plaintiff "had a couple of drinks and became very loud" when discussing his income. (Def.'s Br., Ex. A–14 at 31–32 [Freebairn Dep.].) Mr. Freebairn further stated that Plaintiff had become "aggressive to the point that the waiter . . . came over to see if there was a problem." (*Id.*) Plaintiff denies that he acted inappropriately during the dinner with Mr. Freebairn and attributes his raised voice to loud background noise. (Pl.'s Resp., Ex. 1 ¶¶ 108, 113–17 [Pl. Aff.].)

### iii. The Part-Time Job Incident

In 2004 or 2005, Plaintiff recalls that Mr. Stout became "very upset" when he learned Plaintiff was planning on taking a summer job working weekends at a garden store. (Def.'s Br., Ex. A–5 at 123–24, 133–34 [Pl. Dep.].) Ultimately, Plaintiff did not take the job. (*Id.*) Mr. Stout thought the job would interfere with Plaintiff's work for Defendant. (*Id.*, Ex. A–5 at 133 [Pl. Dep.].)

### f. Evidence of Plaintiff's Performance

### i. Sales Rankings

Mr. Stout testified that the most important factor in rating a sales representative's performance is his sales versus budget percentage. (*Id.*, Ex. A–6 at 66 [Stout Dep.].) Defendant's "stacked rankings" rank sales representatives by their "versus budget" numbers. (Pl.'s Resp., Ex. 4 at 179 [Stout Dep.].) For the most part, the stacked rankings show that

Plaintiff was in the top half of all of Defendant's sales representatives, and generally was doing better than Mr. Sherwood. (*Id.*, SAF ¶ 80; *denied at* Def.'s Reply, RSAF ¶ 80.) When asked in deposition about the basis for his age discrimination claim, Plaintiff stated: "I believe my sales numbers percentagewise [sic] were better than Mr. Sherwood's." (Def.'s Br., Ex. A–5 at 149 [Pl. Dep.]; *see id.*, SOF ¶ 180; *denied at* Pl.'s Resp., RSOF ¶ 180.)[2]

Mr. Stout testified that comparing Plaintiff's versus budget numbers to Mr. Sherwood's was like "comparing apples to oranges" because while Plaintiff served multiple accounts, Mr. Sherwood "had only one account. It was Unisource. Unisource had gone through major downsizing . . . . And [Mr. Sherwood] was selling only [one line of products]. So for his performance to be compared to other people is not equitable." (Def.'s Reply, Ex. A–29 at 186 [Stout Dep.]; *accord* Def.'s Br., Ex. A–6 at 150–52 [Stout Dep.], SOF ¶ 29.)

### ii. The "Performance Screen"

According to an undated "Performance Screen" document from some point during Mr. Stout's tenure, Mr. Stout ranked Plaintiff: (1) in the middle third of all sales representatives for sales performance, new customer development, and relative market share; and (2) in the top third for special pricing requests. (Pl.'s Resp., SAF ¶ 65; *admitted at* Def.'s Reply, RSAF ¶ 65.) The document does not specify where other representatives fell in the rankings, it only states how

---

[2]Citing to his affidavit, Plaintiff denies his testimony and asserts: "While [Plaintiff] did say this at his deposition, this simply means he does not feel that he was terminated for poor job performance. [Plaintiff] is a layman and does not understand the technicalities of the *McDonald* [sic] *Douglas* burden shifting procedure or the intricacies of the legal concept of pretext." (Pl.'s Resp., RSOF ¶ 180 [italics added].) Later in the same brief, however, Plaintiff argues that pretext may be inferred by comparing his *sales numbers* to those of Mr. Sherwood. (*Id.* at 42–45.)

Plaintiff fared relative to the group as a whole.  (*Id.*, Ex. 15 [Undated Performance Screen].)

### iii.    Equity Letters

Plaintiff submitted an "equity letter" to Mr. Stout on or about either July 8, 2004, or July 8, 2005.[3]  (*Id.*, SAF ¶¶ 35–37; *admitted at* Def.'s Reply, RSAF ¶¶ 35–37.)  The letter bears Mr. Stout's handwritten notes, which include positive comments concerning three of Plaintiff's accounts.  (*Id.*, Ex. 4 at 57–58 [Stout Dep.], Ex. 6 [Equity Letter].)

### iv.    Simonson Comment

Defendant's vice president of sales, Bradley Meyers, recalls that, sometime in *2006*, Mr. Simonson said "that our sales force [is] pretty mature or [is] getting pretty old or something to that effect."  (Def.'s Br., Ex. A–20 at 31–32 [Myers Dep.].)  Mr. Simonson, who is in his sixties, recalls making such comments in December 2006.  (*Id.*, Ex. A–21 ¶¶ 3–4 [Simonson Aff.].)

## 2.    Procedural History

On October 10, 2006, Plaintiff filed a complaint alleging Defendant had wrongly terminated him based on his age.  (Verified Compl. and Demand for Jury Trial [filed Oct. 10, 2006].)  On July 9, 2007, Defendant filed its motion for summary judgment, arguing it permissibly fired Plaintiff due to financial restructuring and Mr. Sherwood superior qualifications.  (Def.'s Br.)  On September 14, 2007, Plaintiff filed a response brief.  (Pl.'s Resp.)  On October 22, 2007, Defendant filed a reply brief.  (Def.'s Reply.)  This matter is fully briefed.

## ANALYSIS

---

[3]In light of this letter's notation of a planned "[f]ollow up meeting scheduled August 9, 2005," I surmise it was created in 2005.  (*See* Pl.'s Resp., Ex. 6 [Equity Letter].)

*1.*     *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2007); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e) (2007). A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

## 2.    *Evaluation of Claims*

### a.    *Evidentiary Matters*

#### i.    *Plaintiff's Affidavit*

Defendant complains at length about Plaintiff's 130-paragraph affidavit, asserting it: (1) contradicts Plaintiff's prior testimony; (2) plays word games to suggest false issues of fact; (3) is replete with irrelevant and misleading information; and (4) is based on hearsay. (Def.'s Reply at 39–48.) In general, I agree with Defendant. (*See* Pl.'s Resp., Ex. 1 [Pl. Aff.].) However, almost all of the statements that are misleading, based on hearsay, or contradicted by prior testimony are also irrelevant. As such, I only consider Plaintiff's affidavit to the extent that it actually bears upon the key issues in this case.[4]

#### ii.    *Hearsay*

Plaintiff complains that Defendant's statement of facts is replete with inadmissible hearsay. (*Id.* at 35.) Rule 56 of the Federal Rules of Civil Procedure "precludes the use of inadmissible hearsay testimony in depositions submitted in support of, or in opposition to, summary judgment." *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1555 (10th Cir. 1995). With one exception — asserted fact number forty — I find that the facts to which Plaintiff objects are: (1) inadmissible hearsay; (2) irrelevant; or (3) a combination of the two. (*See* Pl.'s Resp. at 35–36 [objecting to Def.'s Br., SOF ¶¶ 35, 37–40, 45–47, 63, 89, 95, 157–58, 160–61].) Thus, with the

---

[4]Plaintiff's penchant for irrelevant facts may be traced back to Defendant's own statement of facts, itself composed of a staggeringly unnecessary 180 "undisputed" facts. (*See* Def.'s Br., SOF ¶¶ 1–180.)

exception of fact number forty, I reject all the statements of fact to which Plaintiff has objected.

Asserted fact number forty is premised on Mr. Stout's testimony recounting Ms. Freeman's complaints to him. (*See* Def.'s Br., SOF ¶ 40.) The admissibility of this alleged out-of-court statement depends upon the purpose for which it is presented.

"The hearsay rule does not apply to statements offered merely to show that they were made or had some effect on the hearer." *United States v. Martin*, 897 F.2d 1368, 1371 (6th Cir. 1990). Thus, "[a] customer complaint offered to show, for example, that a decisionmaker had notice of the complaint, rather than to prove the specific misconduct alleged in the complaint, is not barred by the hearsay rule." *Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 346 (1st Cir. 1998); *accord Jones v. L.A. Cmty. Coll. Dist.*, 702 F.2d 203, 205 (9th Cir. 1983).

If offered as proof that Ms. Freebairn's alleged complaint was true, Mr. Stout's testimony is inadmissible. *See Ratcliff v. Coca-Cola Bottling Co.*, No. 00–1007, 2001 WL 310962, at *3, *5 (D. Kan. Feb. 28, 2001) (declining to consider customer complaints recounted by supervisor where it "appear[ed] that the defendant [was] attempting to rely on the underlying truth of the complaints"). If, however, offered as evidence that Mr. Stout *received* such a complaint, the testimony is not barred by the hearsay rule. *See Moos v. Hampshire Coll.*, No. Civ.A. 97–30262, 1999 WL 377259, at *5 (D. Mass. June 8, 1999) (considering on summary judgment supervisor's recounting of complaints he received "simply for the fact that they were made and that [the supervisor] heard them"). Thus, I consider Mr. Stout's testimony regarding Ms. Freeman's complaint only as evidence that Mr. Stout had notice of the complaint, not for the underlying truth thereof.

### b.      Age Discrimination

To prove his claim for age discrimination, Plaintiff need not show that age was "the sole motivating factor in the employment decision." *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995) (citations and quotation marks omitted). Rather, Plaintiff need show only that his age was "a reason for the employer's decision and that it was the factor that made a difference." *Id.*

The parties agree that Plaintiff lacks direct evidence of discrimination. (*See* Def.'s Br. at 27; Pl.'s Resp. at 38–39.) Thus, the case must proceed under the familiar *McDonnell Douglas* burden-shifting scheme. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* scheme, Plaintiff bears the burden of establishing a *prima facie* case of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

A *prima facie* case of age discrimination consists of proof that: (1) Plaintiff was within the protected age group; (2) he was doing satisfactory work; (3) he was discharged; and (4) his position was filled by a younger person. *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998). At the *prima facie* stage, Plaintiff's burden is not onerous. *Orr v. City of Albuquerque,* 417 F.3d 1144, 1149 (10th Cir. 2005). Establishment of the *prima facie* case creates a presumption that Defendant unlawfully discriminated against Plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Here, Defendant concedes that Plaintiff has sufficient evidence to establish a *prima facie* case of age discrimination. (Def.'s Br. at 28.) I presume that Defendant is correct.

Once Plaintiff comes forward with *prima facie* proof, the burden of production shifts to Defendant to articulate a facially nondiscriminatory reason for its decision. *Reeves*, 530 U.S. at

143.  Here, Mr. Stout testified that: (1) the loss of Unisource left Mr. Sherwood without any customers; and (2) he chose Mr. Sherwood over Plaintiff for the newly expanded Territory Fourteen based on customer feedback, coworker feedback, and his experience working with both men.  (Def.'s Br., Ex. A–6 at 110, 132, 151 [Stout Dep.]; *accord id.*, Ex. A–11 at 80–82 [Simonson Dep.].)  I find that Defendant has met its burden of production.

Once Defendant's burden of production is met, the presumptions created by Plaintiff's *prima facie* case dissolve and Plaintiff may "resist summary judgment, either by presenting evidence that the employer's reason is pretextual, *i.e.*, unworthy of belief, or by otherwise introducing evidence of a discriminatory motive."  *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002).  Pretext may be shown "by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Id.*  "When assessing whether [a] plaintiff has made an appropriate showing of pretext, [courts] must consider the evidence as a whole."  *Id.* (citing *Washington v. Davis*, 426 U.S. 229, 242 [1976]).

In evaluating pretext evidence, "the relevant inquiry is not whether the employer's reasons were wise, fair or correct; the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them."  *Riggs v. Airtran Airways, Inc.*, 497 F.3d 1108, 1118–19 (10th Cir. 2007) (citation omitted).  Thus, a court must consider the facts as they appeared to the person making the decision, and a court will not "second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment."

*Id.* at 1119. "The reason for this rule is plain: our role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006).

Plaintiff summarizes the overarching theory of his case as follows:

> [I]t was Mr. Sherwood's job that disappeared when the Unisource contract was lost. A jury could reasonably conclude that the logical explanation [sic] would be to release Mr. Sherwood . . . because his one and only reason for being employed [by Defendant] had evaporated. However, [Defendant] opted to discharge [Plaintiff] and give his job to the much younger, less experienced Mr. Sherwood.

(Pl.'s Resp. at 64–65.) In support of this theory, Plaintiff offers fourteen separately numbered arguments against summary judgment. (*See id.* at 39–63.) In order to inject a modicum of organization into this case, I consider Plaintiff's arguments out of the order in which they were made.

### i. *The Import of the* **Prima Facie** *Case*

Plaintiff's first argument warrants verbatim repetition:

> [Defendant] admits that [Plaintiff] can prove a *prima facie* case. . . . In effect, [Defendant] admits that [Plaintiff] was doing satisfactory work and that he was discharged despite the adequacy of his work, then contends that [Plaintiff] was terminated for "performance issues." It is contradictory and illogical for [Defendant] to on [sic] one hand say [Plaintiff's] work was satisfactory and then to say on the other hand it was not. This contradiction alone is enough to establish an inference of pretext and summary judgment is therefore not appropriate.

(*Id.* at 51–52.)

This argument suggests that Plaintiff is not the only person involved in this case that "does not understand the technicalities of the *McDonald* [sic] *Douglas* burden shifting procedure or the

intricacies of the legal concept of pretext."  (*See id.*, RSOF ¶ 180 [italics added].)  While no one can fault Plaintiff for his lack of understanding, counsel's misunderstanding is another matter entirely.  If counsel's view were correct, once a plaintiff proves his *prima facie* case, he is categorically entitled to trial, regardless of the frailty of his evidence rebutting the defendant's proffered nondiscriminatory reason for adverse action.  This is not the law.

"'Proof of a *prima facie* case does no more than entitle the plaintiff to an inference of discrimination; it is not equivalent to a factual finding to that effect.'"  *MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1120 (10th Cir. 1991), *overruled on other grounds as recognized in Hare v. Denver Merch. Mart, Inc.*, No. 06–1270, 2007 U.S. App. LEXIS 25799, at *21 (10th Cir. Nov. 2, 2007) (quoting *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 512 [7th Cir. 1986]).  This is sensible because, in this circuit, *prima facie* proof of satisfactory work performance may be established through the plaintiff's testimony that his work was satisfactory.  *MacDonald*, 941 F.2d at 1121.  As such, it is inappropriate for an employer to raise its legitimate, nondiscriminatory reason at the *prima facie* stage.  *Id.* (quoting *Yarbrough*, 789 F.2d at 512).  However, once the *prima facie* case is made, and the employer produces a nondiscriminatory reason, "the plaintiff can avoid summary judgment *only if* []he is able to show that a genuine dispute of material fact exists as to whether the defendant's articulated reason was pretextual."  *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1165 (10th Cir. 2000) (emphasis added) (citation and quotation marks omitted).  I focus on whether Plaintiff has raised such an issue of fact in each of the proceeding subsections.

### ii. *Performance-Related Evidence*

Throughout his brief, Plaintiff points to a variety of evidence that he believes to show either that Defendant regarded his performance as satisfactory or that Plaintiff outperformed Mr. Sherwood. I consider that evidence and the related arguments below.

A. STACKED RANKINGS. — As noted above, Plaintiff testified that the basis of his age claim is his belief that his "sales numbers . . . were better than Mr. Sherwood's." (Def.'s Br., Ex. A–5 at 149 [Pl. Dep.].) Thus, Plaintiff argues that Defendant's stacked rankings suggest he was a better sales representative than Mr. Sherwood. (Pl.'s Resp. at 42, 52–53.) Even assuming that the stacked rankings yield a fair comparison between a sales representative with one client and a sales representative with multiple clients, the evidence fails to reveal a meaningful difference between Plaintiff and Mr. Sherwood.

In the context of a promotion decision, the Tenth Circuit has "cautioned that pretext cannot be shown simply by identifying minor differences between [the] plaintiff's qualifications and those of successful applicants, but only by demonstrating an 'overwhelming' merit disparity." *Santana v. City & County of Denver*, 488 F.3d 860, 865 (10th Cir. 2007). I find that *Santana* is applicable here because the decision between Plaintiff and Mr. Sherwood — *i.e.*, the consideration of two candidates for one position — is analogous to the decision between two candidates for a promotion.

Year-to-date ("YTD") numbers for 2004 hardly suggest an "overwhelming" disparity between Plaintiff and Defendant: in December 2004, Plaintiff was at 92.4 percent of budget YTD and Mr. Sherwood was at 86.7 percent. (Pl.'s Resp., SAF ¶ 63; *admitted in relevant part at*

Def.'s Reply, RSAF ¶ 63.)  The YTD numbers for May 2005, the last month Plaintiff appears in the rankings, show Plaintiff at 101.6 percent and Mr. Sherwood at 92.3 percent.  (*Id.*, Ex. 16 at 16 [Stacked Rankings].)  Even construing the evidence in the light most favorable to Plaintiff, I cannot say that a six to nine percent difference constitutes evidence of an "overwhelming" merit disparity — and Plaintiff comes forward with no evidence suggesting that it does.[5]  (*See* Pl.'s Resp.)  Thus, even assuming that the stacked rankings are a relevant basis for comparing Plaintiff to Mr. Sherwood, the rankings fail to reveal that Plaintiff meaningfully outperformed his replacement.

B. MR. SHERWOOD'S QUALIFICATIONS. — Plaintiff attacks Mr. Sherwood's qualifications from three different angles.  I consider each attack in turn.  Plaintiff first argues that Mr. Sherwood had inferior "product knowledge."  (*See id.* at 59–60.)  Citing to his own affidavit, Plaintiff obliquely asserts: "Mr. Sherwood did not have a [sic] better knowledge of [JanSan] products because of [my] experience selling to Motel 6."  (*Id.* at 60.)  In the paragraphs of his affidavit upon which he purports to rely, Plaintiff reveals that he sold JanSan products to a hotel chain — in his *previous* job.  (*Id.*, Ex. 1 ¶¶ 54–56 [Pl. Aff.].)  I note that Plaintiff worked for Defendant for approximately eleven years.  (Def.'s Br., SOF ¶¶ 5–6; *admitted at* Pl.'s Resp., RSOF ¶¶ 5–6.)  I further note that Plaintiff neglects to indicate whether his prior employer sold JanSan products similar to those of Defendant.  (*See* Pl.'s Resp.)  Even assuming it is reasonable

---

[5]Indeed, Plaintiff's evidence may suggest that the difference was modest.  For example, the highest ranked representative in May 2005 was at 124.2 percent, while the lowest ranked representative was at 60.4 percent — a difference of forty-one percent.  (Pl.'s Resp., Ex. 16 at 16 [Stacked Rankings].)

to make inferences on Plaintiff's behalf to overcome such an evidentiary lacuna, his citation is still deficient because it does not speak at all to *Mr. Sherwood's* experience with JanSan products. (*See id.*)  Plaintiff's own testimony suggests that the difference in knowledge between the two men is anything but "overwhelming:"

> Q:    Do you know what [Mr.] Sherwood['s] . . . sales background is as far as products?
> A:    [Mr. Sherwood] was real [sic] strong on floor finishes, restroom cleaning, janitorial products.
> Q:    Jan[S]an?
> A:    Yes.
> Q:    He was real [sic] strong on [J]an[S]an?
> A:    I wouldn't classify him as real strong.
> Q:    Okay.
> A:    There were certain areas that he was good, which was [sic] floor finishes and restroom care.

(Def.'s Br., Ex. A–5 at 92 [Pl. Dep.]; Pl.'s Resp., Ex. 19 at 93 [Pl. Dep.].)  When viewed in the light most favorable to Plaintiff, the evidence suggests that Plaintiff had sold JanSan products some eleven years in the past and that Mr. Sherwood had "good" present working knowledge of the same.  Such evidence does not suggest pretext.

Second, Plaintiff points to the testimony of Brad Myers, Defendant's vice president of sales, and Douglas Schoeni, one of Plaintiff's former clients.  (Pl.'s Resp. at 55–56, 59–61.)  Both men testified that Plaintiff was a better salesman than Mr. Sherwood.  (*Id.*)  "Evidence indicating that an employer misjudged an employee's performance or qualifications is, of course, relevant to the question whether its stated reason is a pretext masking prohibited discrimination."  *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000).  The evidence here is of marginal relevance to the question whether Defendant misjudged Plaintiff's performance.  Mr.

Myers did not explain why he believed Plaintiff was the superior sales person; he said only that Plaintiff was "capable of doing the job." (*See* Pl.'s Resp., Ex. 20 at 32–33 [Myers Dep.].) Mr. Schoeni based his comparison on one sales presentation Mr. Sherwood gave in Spring *2006*. (*See id.*, Ex. 3 ¶ 12–15 [Schoeni Dep.].) Most importantly, neither Mr. Myers nor Mr. Schoeni testified to *any awareness of the complaints* lodged against Plaintiff by his customers or his coworkers, which I discuss below. (*See id.*, Ex. 3 [Schoeni Aff.], Ex. 20 [Myers Dep.].) Accordingly, this evidence is marginal at best.

Finally, Plaintiff impugns Mr. Sherwood's experience developing new clients for Defendant. (*Id.* at 47.) Were Mr. Sherwood's credentials as sparse as Plaintiff insinuates, this argument might have some traction. However, Plaintiff's attack on Mr. Sherwood's experience is undermined by at least undisputed two facts: (1) Plaintiff himself recommended that Defendant hire Mr. Sherwood (*id.*, Ex. 19 at 135–36 [Pl. Dep.]); and (2) Defendant subsequently promoted Mr. Sherwood into a position where he worked with Plaintiff and other sales representatives "to help them *develop new business*" (Def.'s Br., SOF ¶¶ 32–33; *admitted at* Pl.'s Resp., RSOF ¶¶ 32–33 [emphasis added]).

In light of the foregoing, I find that Plaintiff has failed to come forward with evidence giving rise to a genuine issue of material fact regarding whether there was "overwhelming" merit difference between himself and Mr. Sherwood. *See Odom v. Frank*, 3 F.3d 839, 847 (5th Cir. 1993) (in order to support an inference of pretext, a difference in qualifications must be so glaring as to "jump off the page and slap us in the face"); *accord Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1309 (10th Cir. 2005).

C.  Further Performance-Related Evidence. — Beyond arguing that he was a better sales representative than Mr. Sherwood, Plaintiff comes forward with a variety of evidence he claims to demonstrate that his overall performance was satisfactory.  (*See* Pl.'s Resp. at 52–53, 57–58.)  While I find that while such evidence is most certainly relevant, it will be seen that it is not particularly probative given the facts of this case.

First, Plaintiff argues that his "longevity of service" and the fact that he won two sales awards "show[] he was performing satisfactorily."  (*Id. at* 53.)  I agree that the caselaw supports consideration of, *inter alia*, years of service and receipt of performance-related awards as part of the evidentiary picture relevant to pretext.  *See, e.g.*, *Townsend v. Lumbermens Mutual Cas. Co.*, 294 F.3d 1232, 1242 (10th Cir. 2002).  While this evidence generally suggests that Plaintiff was a good, experienced employee, it would, of course, be much more probative had Plaintiff also demonstrated that Mr. Sherwood received no similar positive reinforcement.  Plaintiff did not. (*See* Pl.'s Resp.)  To the contrary, Plaintiff admits that Defendant promoted Mr. Sherwood to the position of Regional Manager in early 2005, and does not contend that such promotion was unwarranted.  (*See* Def.'s Br., SOF ¶ 32; *admitted at* Pl.'s Resp., RSOF ¶ 32.)

Second, Plaintiff asserts his good performance may be inferred from an undated "Performance Screen" evaluation, which placed him in the middle third in three sales performance categories and in the top third in one category, for a total of eighty out of one-hundred points. (Pl.'s Resp. at 53, Ex. 15 [Undated Performance Screen].)  The only representative mentioned by name on this document is Plaintiff himself.  (*Id.*)  Had Plaintiff furnished a copy of Mr. Sherwood's Performance Screen, this evidence would become much more useful.  As it stands,

the Performance Screen merely shows Plaintiff's performance in relation to *all* other sales representatives on an unstated date. At best, this is marginal evidence.

Third, Plaintiff points to Mr. Stout's handwritten comments on the July 2005 equity letter and argues that such comments indicate "Mr. Stout was satisfied with [Plaintiff's] efforts and told him to keep doing what he was doing." (*Id.* at 53.) In the letter, Mr. Stout: (1) praised Plaintiff for doing a "ride with" by writing "Keep it up!"; (2) wrote "nice how much" next to a statement reflecting a sale; and (3) wrote "keep supporting this excellent new . . . partner" next to a statement about a "meeting to discuss liquids" with a client. (*See id.*, Ex. 6 [Equity Letter].) While these statements reveal satisfaction with *aspects* of Plaintiff's performance, the letter does not support a reasonable inference that Plaintiff's *overall* performance was satisfactory. *See Perry v. St. Joseph Reg'l Med. Ctr.*, 110 F. App'x 63, 68 (10th Cir. 2004) ("[P]retext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations.").

Fourth, Plaintiff highlights a chart plotting his sales history from 1993 to 2004. (Pl.'s Resp. at 52, Ex. 13 [Territory Fourteen Sales].) Other than pointing out that the chart "shows continually increasing sales," Plaintiff does not explain how the chart fits into the evidentiary picture. (*See id.* at 52.) Defendant comes forward with another chart, which shows that when Unisource sales are taken out of the picture, Plaintiff's total sales had trended downward since 2000.[6] (Def.'s Reply, Ex. A–28 at 101–02 [Simonson Dep.], Ex. A–30 [Territory 14 Non-

---

[6]The parties butt heads over CEO George Seladi's testimony that Plaintiff was a "flatliner" who, when Unisource was taken out of the picture, had a shrinking record of sales. (*See* Def.'s

Unisource Sales].)  This evidence is scant support for any conclusion, let alone a inference of

pretext — particularly given that the evidence does not compare Plaintiff to Mr. Sherwood.

On balance, construing all of the performance-related evidence, with a particular emphasis

on the stacked rankings and the Performance Screen, in the light most favorable to Plaintiff, I find

the evidence may support a reasonable inference that Plaintiff's overall performance was

satisfactory.  Below, I consider how such an inference fits into the broader evidentiary picture.

### iii.    *Reliance on Customer Complaints*

Under a heading titled "[t]he supposed reliance on complaints from three customers is

pretext," Plaintiff offers a rambling spread of narrow factual arguments.  (*See* Pl.'s Resp. at

47–49.)  While Defendant does a thorough job of engaging the minutiae of Plaintiff's arguments

(*see* Def.'s Reply at 62–65), Defendant neglects to address two broad arguments that can be

distilled from Plaintiff's discursive wanderings: (1) the customer complaints upon which Mr. Stout

relied were unfounded; and (2) had the complaints been truly serious, Mr. Stout would have

considered firing Plaintiff when they were made (*see* Pl.'s Resp. at 47–49).  Plaintiff's first

argument takes too broad a view of the evidence, and the second argument loses sight of the

context in which Plaintiff was terminated.

An employer's receipt of complaints from customers is, by itself, a legitimate reason to

terminate an employee.  *See Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 862 (5th Cir.

---

Br., Ex. A–3 at 21–22 [Seladi Dep.].)  In squabbling over this evidence, the parties overlook Mr.
Seladi's admission that he never discussed this perception with Plaintiff or any of Plaintiff's
superiors.  (*Id.*, Ex. A–3 at 22 [Seladi Dep.].)

1993).  Thus, the question before the court is not whether Mr. Stout's reliance on the complaints was "wise, fair or correct," but rather whether Mr. Stout honestly believed the complaints and acted in good faith thereupon.  *Riggs*, 497 F.3d at 1119.  Of course, were the complaints themselves unworthy of belief, an inference of pretext might reasonably be drawn.  *See Danville*, 292 F.3d at 1250.  Here, the complaints Mr. Stout heard from Unisource, Brody Chemical, and Ikon were all unequivocally related to Plaintiff's job duties.  (*See Facts* § 1e[i], *supra.*) Moreover, the complaints came from *third parties*.  Although Plaintiff disputes the occurrence of each incident forming the basis of each of the three complaints, he comes forward with no evidence suggesting that Mr. Stout *did not receive* the complaints.  (*See* Pl.'s Resp.); *see Piercy*, 480 F.3d at 1200 ("Even a mistaken belief can be a legitimate, non-pretextual reason for an employment decision.").  Nor does Plaintiff present evidence that Mr. Stout knew or should have known the complaints were untrue.  (*See* Pl.'s Resp.)  As such, Plaintiff has failed to present evidence suggesting Mr. Stout did not honestly believe the customer complaints.

Plaintiff would have the court make much of the absence of evidence that Mr. Stout confronted him after receiving complaints from Ms. Freeman and Mr. Black.  (*See id.* at 47–49.) Plaintiff suggests that this failure supports an inference that Mr. Stout used such complaints as an excuse to terminate Plaintiff based on his age.  (*See id.*)  Such conjecture loses sight of the context in which Plaintiff's termination came about.  The undisputed evidence reveals that the situation before Mr. Stout at the time he received the two complaints — *i.e.*, prior to the loss of the Unisource account — was starkly different from the situation when he elected to replace Plaintiff with Mr. Sherwood.  (*See* Def.'s Br., SOF ¶¶ 100, 103, 105–110, 116; *admitted at* Pl.'s

Resp., RSOF ¶¶ 100, 103, 105–110, 116.)  The loss of Unisource precipitated Defendant's

decision to expand Territory Fourteen.  (*See id.*; *see also id.*, SOF ¶ 139; *admitted at* Pl.'s Resp.,

RSOF ¶ 139.)  The loss of Unisource also left Mr. Sherwood, Plaintiff's superior, without any

accounts to service.  (Pl.'s Resp., SAF ¶ 54; *admitted at* Def.'s Reply, RSAF ¶ 54.)  The

undisputed evidence thus further reveals that, at the time Mr. Stout recommended that Plaintiff be

terminated, Mr. Stout had two employees who were familiar with Territory Fourteen, but only

one job to fill.[7]  (*See* Def.'s Br., SOF ¶¶ 119, 146; *admitted at* Pl.'s Resp., RSOF ¶¶ 119, 146.)

Hence, the loss of the Unisource account forced a choice between two generally qualified

candidates, so the ambit of information relevant to the selection of one candidate over the other

was necessarily greater than in a standard termination decision.  Consequently, even if the

complaints of Ms. Freeman and Mr. Black were not perceived as grounds for disciplinary action

at the time they were received, they were most certainly relevant to the choice between Plaintiff

and Mr. Sherwood.  That Mr. Stout relied on such comments does not support a reasonable

inference of pretext.

### iv.     *Internal Complaints*

Construing his scattershot arguments generously, Plaintiff next appears to assert that the

complaints which: (1) Mr. Sherwood brought to Mr. Stout were fabricated; and (2) Mr. Freebairn

---

[7]Plaintiff does not argue that pretext can be inferred from the fact that Defendant does not appear to have considered placing Mr. Sherwood in any of its other territories.  (*See* Pl.'s Resp.) Perhaps this omission is best understood in light of Plaintiff's failure to proffer any evidence contradicting Mr. Stout's testimony that Mr. Sherwood was comfortable with Territory Fourteen and had industry contacts therein.  (Def.'s Br., SOF ¶ 146; *admitted at* Pl.'s Resp., RSOF ¶ 146.)

brought to Mr. Stout were subjective and, on the whole, insignificant. (Pl.'s Resp. at 43–44.) Defendant characterizes Plaintiff's argument as nitpicking that avoids the key question: whether Mr. Stout "sincerely believed" the complaints about Plaintiff. (Def.'s Reply at 61–62.) I first address Mr. Sherwood's complaints and then turn to those of Mr. Freebairn.

Mr. Sherwood told Mr. Stout that he had received "numerous" customer complaints about Plaintiff, such as that: (1) Plaintiff lacked knowledge of JanSan products; (2) Plaintiff had problems with his appearance and lack of professionalism; and (3) Plaintiff's motivation had waned. (Def.'s Br., SOF ¶¶ 43–44; *admitted at* Pl.'s Resp., RSOF ¶¶ 43–44.) Additionally, Mr. Sherwood complained to Mr. Stout that Plaintiff resisted his direction. (*Id.*, SOF ¶ 90; *admitted at* Pl.'s Resp., RSOF ¶ 90.) In mounting an attack on this evidence, Plaintiff first emphasizes that "Mr. Sherwood had expressed a desire to move to Utah" and then argues "[t]he court should be leery of a termination based on complaints and adverse information from a low level supervisor who obviously wanted to move into [Plaintiff's] territory, and ultimately did replace [Plaintiff]." (Pl.'s Resp. at 43.) Plaintiff's argument and the evidence supporting it suggests that Mr. Sherwood made the complaints not because of discriminatory bias, but rather because Mr. Sherwood *wanted to move to Utah.* (*See id.*, Ex. 1 ¶ 64 [Pl. Aff.] Ex. 19 at 99 [Pl. Dep.]); *cf. EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 485 (10th Cir. 2006) (stating an employer may be held liable where "biased subordinate's *discriminatory* reports, recommendation, or other actions caused the adverse employment action" [emphasis added]). Regardless, Plaintiff *admits* that Mr. Sherwood made these complaints to Mr. Stout and, moreover, comes forward with no evidence that Mr. Stout was aware that Mr. Sherwood's complaints might have been biased.

Absent evidence that Mr. Stout had any reason to doubt Mr. Sherwood's complaints, an inference of bad faith is inappropriate. *See Piercy,* 480 F.3d at 1200.

Mr. Freebairn testified that he told Mr. Stout that Plaintiff: (1) did not know the names of the new representatives of two of his own clients; (2) was not calling on the "[T]riple S" account; and (3) had become loud and aggressive with Mr. Freebairn when the two discussed Plaintiff's compensation over dinner. (Def.'s Br., Ex. A–14 at 22, 24–25, 66 [Freebairn Dep.].) Plaintiff attacks these complaints as subjective and insignificant. (*Id.* at 43–44.) No reasonable juror would view these complaints, coming from a company vice president, as such. The first two relate plausible, specific incidents that reflect poorly on Plaintiff's performance; the last relates a plausible, specific incident that suggests a lack of judgment and decorum. Once again, absent evidence that Mr. Stout had reason to doubt Mr. Freebairn's complaints, Mr. Stout's reliance on such complaints cannot support an inference of pretext.

### *v.* **Reduction in Force**

Relying on a recent ADEA case, *Miller v. Eby,* 396 F.3d 1105 (10th Cir. 2005), Plaintiff argues that Defendant used a reduction in force as an excuse to replace Plaintiff with Mr. Sherwood. (Pl.'s Resp. at 39–41; *see also id.* at 54–55.) In *Miller,* the plaintiff presented credible evidence that when he was terminated, he was told his position was being *eliminated* and his job duties were being taken over by a coworker, but the employer actually *replaced* the plaintiff the next day with someone from outside the company who was twenty-four years younger. 396 F.3d at 1112. The court determined this evidence supported an inference of pretext. *Id.* Unlike in *Miller,* Defendant here cannot be said to have lied — that is, Mr. Stout did

not tell Plaintiff his job was being eliminated and then underhandedly hire a younger person to fill the job.  Mr. Stout told Plaintiff he was being terminated for "poor performance" and chose to make no mention of his plans for Territory Fourteen.  (Def.'s Br., Ex. A–6 at 103–04 [Stout Dep.].)  *Miller* does not stand for the proposition that an employer owes an employee a full explanation upon termination;  it stands for the proposition that pretext can be inferred from a "disingenuous" explanation.  *See* 396 F.3d at 1112.  *Miller* gets Plaintiff nowhere.

To the extent Plaintiff argues that discriminatory intent can be inferred from the fact that Mr. Stout did not tell Plaintiff his termination was part of corporate downsizing, I cannot agree.  (*See* Pl.'s Resp. at 41.)  Plaintiff's argument suggests a false dichotomy — that he was fired *either* because of poor performance *or* due to a downturn.  Of course, this dichotomy purposely excludes a third possibility — that Plaintiff lost his job for *both* reasons.  Mr. Stout testified that Plaintiff's termination was brought about by a corporate downturn, but that he chose Plaintiff for elimination because of poor performance.  (Def.'s Br., Ex. A–6 at 103–04 [Stout Dep.].)  That is, the downturn precipitated Plaintiff's termination, but his performance was the reason he was selected.  The mere fact that Mr. Stout chose not to mention the downturn when he fired Plaintiff is inconsequential.  "An employer need not inform an employee of all possible reasons it may have for terminating an employee."  *Steele v. City of Bluffton*, 31 F. Supp. 2d 1084, 1096 (D. Ind. 1998).  These circumstances hardly support an inference that Mr. Stout is lying to hide age discrimination.

### vi.    *Further Arguments*

Having considered the weightier arguments in the case, I now turn to those which merit

only brief discussion. I do not address those arguments which are unsupported by record evidence. *See L & M Enters., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000) ("Unsupported conclusory allegations . . . do not create a genuine issue of fact.").

First, Plaintiff argues that inconsistencies between Mr. Stout's and Mr. Simonson's respective accounts of who made the decision to terminate Plaintiff support a reasonable inference of pretext. (Pl.'s Resp. at 41.) I disagree. In his deposition, Mr. Simonson asserted that, although he had "the authority to countermand" Mr. Stout's recommendations, "[he] agreed with [Mr. Stout's] decision" to terminate Plaintiff. (Def.'s Br., Ex. A–11 at 85–86 [Simonson Dep.].) Mr. Stout testified: "I recommended to Mr. Simonson who I thought would be the best candidates to go forward, and then we made the decision. And the decision went up the line from there." (*Id.*, Ex. A–6 at 96 [Stout Dep.].) No reasonable juror would infer pretext from such consistent testimony.

Second, Plaintiff asserts the fact that he "was never offered the opportunity to show what he could do with Territory [Fourteen] after the loss of Unisource . . . is further evidence of pretext." (Pl.'s Resp. at 56.) Plaintiff neglects to furnish any authority suggesting Defendant had an obligation to offer Plaintiff any such opportunity. (*See id.*) I find that the ADEA imposes no such obligation. *See generally* 29 U.S.C.A. § 621 *et seq.* (West 2007).

Third, Plaintiff emphasizes that Mr. Patterson, the other sales representative terminated for poor performance, was placed on a performance improvement plan prior to his termination. (Pl.'s Resp. at 57–58.) Thus, Plaintiff argues "if Mr. Stout truly had issues with [Plaintiff's] job performance[,] he would have placed [Plaintiff] on a performance plan also." (*Id.* at 57.) In a

case where an employee was fired absent a need for downsizing, such evidence might reasonably support a finding of pretext. However, in the instant case, Plaintiff's comparison to Mr. Patterson does not withstand scrutiny. As discussed above, given Defendant's need to downsize, performance issues that did not mandate remedial action in the past were clearly relevant to the choice between Plaintiff and Mr. Sherwood.

Fourth, Plaintiff argues that a comment made by Mr. Simonson in *2006* "is one more log on the pretext fire that will cook [Defendant's] discriminatory goose." (*Id.* at 59–60.) Setting aside Plaintiff's bizarre rhetoric, I find that Mr. Simonson's comment does not create a jury issue. First, it was made *after* Plaintiff's termination. (*See* Def.'s Br., Ex. A–20 at 31–32 [Myers Dep], A–21 ¶ 4 [Simonson Aff.].) Second, Mr. Myers merely recalls that Mr. Simonson said that Defendant's sales force "was pretty mature or it was getting pretty old or something to that effect." (*Id.*, Ex. A–20 at 31 [Myers Dep].) No reasonable juror would view this single comment as evidence suggesting that Defendant terminated Plaintiff because of his age in July 2005. *See generally Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) (stating "stray remarks" are insufficient to create a jury issue in an ADEA case).

Fifth, Plaintiff devotes two brief sentences to his argument that he "is entitled to an inference that age did play a part in the July 2005 job terminations," because the other three sales representatives who were laid off were over the age of fifty. (Pl.'s Resp. at 40.) Plaintiff's conclusory argument makes no effort to explain *why* the ages of the three terminated men support an inference that he was fired based on his age. (*See id.* at 40.) This appears to be so because Plaintiff's brief is devoid of any *evidence* suggesting that the process by which those three men

were selected was suspicious, let alone discriminatory.[8] (*See id.*) Rather, Plaintiff *admits* Defendant's explanation of how it arrived at its decision to consolidate the territories of those three representatives. (*See* Def.'s Br., SOF ¶¶ 100–11, 119–121; *admitted at* Pl.'s Resp., RSOF ¶¶ 100–11, 119–21.) Moreover, it has been said that "the mere fact that the five fired employees fell within the protected class, without more, does nothing to cast doubt upon [an employer's] articulated reasons for discharging [the plaintiff]." *Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 305 (7th Cir. 1996).

Sixth, Plaintiff points to Mr. Stout's August 2005 email announcement that Plaintiff had left Defendant "to pursue other opportunities." (Pl.'s Resp. at 59.) Plaintiff argues, "[o]f course, this was not true," and asserts that this statement supports a finding of pretext. (*Id.*) This argument is patently disingenuous. No reasonable juror would infer pretext from the fact that Mr. Stout whitewashed the reason for Plaintiff's departure in a company-wide announcement.

Seventh, Plaintiff notes that Mr. Sherwood was entitled to a higher salary than Plaintiff. (*Id.* at 61–62.) Plaintiff thus argues that it made "no economic sense" for Defendant to select Mr. Sherwood because it could have paid Plaintiff less money to do the same work. (*Id.*) Absent

----

[8]The evidence reveals that Messrs. Stout and Simonson are both older than Plaintiff. While certainly nondispositive, the fact that the men who agreed to terminate Plaintiff were both members of Plaintiff's protected class could be said to weaken any inference of discrimination. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (finding that age discrimination plaintiff faced a "difficult burden" where "all of the primary players behind his termination . . . were well over the age of forty"). *But see Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361 (7th Cir. 2001) (emphatically rejecting such an approach in *dictum*); *cf. Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1456 n.5 (10th Cir. 1994) (rejecting argument "that pretext can be inferred because the supervisors responsible for deciding that [p]laintiff would be laid off were all under the age of forty").

proof that the salary difference between Mr. Sherwood and Plaintiff was sufficient to do substantial, foreseeable economic harm to Defendant's business, this court defers matters of "economic sense" to Defendant's business judgment. *See Riggs*, 497 F.3d at 1118–19 (stating it is not a court's place to evaluate whether business decisions are "wise, fair or correct"). The mere fact that Defendant selected a higher salaried employee from outside the protected class over a lower salaried protected employee cannot support a reasonable inference of pretext.

Finally, Plaintiff passingly complains that Mr. Stout relied on "subjective" determinations, such as his conclusion that Plaintiff was not a "team player," in selecting Mr. Sherwood over Plaintiff. (*See* Pl.'s Resp. at 44.) The mere fact that some subjective criteria were employed in the context of a broader evaluation does not warrant an inference of pretext. *Riggs*, 497 F.3d at 1120 (citing *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1194 [10th Cir. 2006]); *see Chapman v. A.I. Transport*, 229 F.3d 1012, 1034 (11th Cir. 2000) ("[S]ubjective reasons are not the red-headed stepchildren of proffered nondiscriminatory explanations for employment decisions.").

### *vii.* **Summation**

Based on all of the foregoing and considering the evidence as a whole, I find that Plaintiff has come forward with evidence revealing that his performance was such that, absent the loss of Unisource, he likely would not have been fired. However, that evidence stands at odds with the undisputed proof that the loss of Unisource placed Mr. Sherwood in competition with Plaintiff. Given such circumstances, I find that it is unreasonable to infer pretext for discrimination from Mr. Stout's selection of Mr. Sherwood, particularly given, *inter alia*, (1) evidence of Mr. Stout's

awareness of multiple complaints relating to Plaintiff's motivation, professionalism, decorum, judgment, and customer service; (2) evidence of Defendant's confidence in Mr. Sherwood, as demonstrated by his promotion into a management position where he supervised Plaintiff and other sales representatives; and (3) the absence of evidence of any customer or coworker complaints against Mr. Sherwood. Consequently, I find that Plaintiff has failed to present sufficient evidence that the proffered reasons for his termination were so beset by "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" as to allow a reasonable jury to infer Defendant is lying to hide the fact that it fired Plaintiff based on his age. *See Danville*, 292 F.3d at 1250.

*3.      Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.      DEFENDANT's motion (#32) is GRANTED.

2.      The clerk shall forthwith enter judgment in favor of Defendant and against Plaintiff, dismissing Plaintiff's claims with prejudice. Defendant may have its costs by filing a bill of costs within eleven days of the date of this order.

Dated this 14th day of December, 2007

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge